UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHANDERKUMAR V. SHROFF, <br><br> Plaintiff / Counter-Defendant, <br><br> v. <br><br> ROSENTHAL COLLINS GROUP, LLC and MF GLOBAL INC., <br><br> Defendant / Counter-Plaintiffs. | No. 08 C 929 <br><br> Judge James B. Zagel |

# MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff, Chanderkumar Shroff, is a resident of Dubai and owner of a fabric business. Defendant MF Global Inc. ("MF Global") is a future commission merchant ("FCM").[1] Until July 2007, MF Global was known as Man Financial Inc. Around November 2005, Man Financial Inc. purchased certain assets from Refco, LLC ("Refco"), another FCM, and thereafter had a division called the "Man Financial, Refco Division." Defendant Rosenthal Collins Group, LLC ("RCG") is also a FCM.

Plaintiff seeks damages for extensive losses from trading in his accounts at Refco, Man Financial, and RCG. He alleges that Defendants, through their agent Niraj Goel, carried out a fraudulent commodity futures investment scheme that caused Plaintiff substantial damages.

---

[1] An FCM is an entity " ... engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market ...." 7 U.S.C. § 1a.

Plaintiff has alleged numerous counts based on the Commodity Exchange Act[2] as well as various state claims.[3] Defendants have moved for summary judgment on all counts.

## II. STATEMENT OF FACTS

### A. History

In 2005, an acquaintance of Plaintiff, Kunhimon Ibrahim, introduced Plaintiff to Niraj Goel, the owner of Zentrum. Goel was in the business of using computerized software to trade in the futures market and providing courses about this type of electronic trading. Zentrum is a Foreign Correspondent or foreign broker that introduces customers to FCMs. A Foreign Correspondent is similar to an introducing broker,[4] but it is not required to register with the Commodity Futures Trading Commission ("Commission" or "CFTC").

During the second meeting between Plaintiff and Goel, Goel introduced Plaintiff to StrategyBot, a company that provides an automated, electronic trading platform. Goel indicated to Shroff that he did business with StrategyBot as well as various FCMs, including Man Financial Inc., Refco, and RCG. Goel also indicated that he was an agent for the various FCMs, whereby he introduced clients to the FCMs and aided clients in opening trading accounts with the

---

[2] Count I: Fraud under the CEA; Count II: Options Fraud under the CEA; Count III: Fraud of Commodity Trading Advisors under the CEA; Count IV: Aiding and Abetting Violation under the CEA
[3] Count V: Consumer Fraud Act; Count VI: Fraud; Count VII: Conspiracy to Defraud; Count VIII: Breach of Fiduciary Duty; Count IX: Negligent Supervision; Count X: Breach of Contract; Count XI: Unjust Enrichment
[4] Introducing Broker is defined by the Commodity Exchange Act as "any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant) engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. §1(23).

FCMs. Goel showed Plaintiff the StrategyBot and Zentrum websites. Plaintiff contends both websites displayed RCG and Refco logos. From these interactions, and based on statements made by Goel, Plaintiff was led to believe that Goel "was the face of these [] FCMs" and that he would be putting his money into the FCMs through Goel.

Goel continued to make representations to Plaintiff, including that StrategyBot offered certain conservative software strategies where there was "literally no loss in the long term." Goel indicated that if Plaintiff was to invest his money with Zentrum there may be short term losses, but in the long term there would be profits of 60-80%. Goel stated that the "long term" was "six months to one year." Goel further represented that he would only receive compensation from trading profits, that all trades would be made by the conservative, automated StrategyBot system, and that Zentrum's other clients were doing very well. Plaintiff replied by indicating that he would consider investing $1 million, but that he could not afford to lose such an investment. In addition, Plaintiff claims to be computer illiterate and possess no trading knowledge or experience.

At a final meeting between Goel and Plaintiff, Plaintiff re-represented that he couldn't afford to lose the money. In response, Goel suggested Plaintiff grant Ibrahim a power of attorney. Under this setup, Plaintiff believed that StrategyBot software would do all the trading and Ibrahim would receive the account statements. This led Plaintiff to believe he would be "double assured" that his investment was safe. It was not disclosed to Plaintiff that Ibrahim and Goel had recently entered into a commission sharing agreement. Plaintiff agreed to invest $1 million dollars with Zentrum.

**B. Documents**

Plaintiff signed a large stack of papers, including account opening forms for four FCMs, an asset management agreement between Zentrum and Plaintiff, power of attorney forms, wire transfer instructions, and other bank forms. Plaintiff signed the forms without fully reading or completing the documents; customer information was filled in later, presumably by Goel, Ibrahim, or Goel's employee. Goel assured Plaintiff that this was a normal bank account opening procedure and the forms were normal bank account opening forms. Though Plaintiff admits that he signed the printed forms, Plaintiff disputes that he "agreed" to the terms of the above agreements. He alleges that the agreements are not enforceable against him because they were procured by fraud. Plaintiff further contends that because he is not computer literate, he did not fill out or sign any electronic account opening forms. Plaintiff states that if Goel had told him there was a risk of losing money, he would not have signed the forms. He also frequently relies on the fact that Goel represented the documents were normal bank account opening forms and that this was a normal procedure as a justification for signing the documents without completing them or reading them in full.

The completed account opening documents represented Plaintiff to be a high net worth individual with ten years of trading experience who understood the risks of futures trading. The RCG customer agreement bound Plaintiff to indemnify RCG for attorney's fees. However, this form is electronic and Plaintiff disputes that he filled in or signed any electronic account opening form. The Man Financial customer agreement stated that "if [Plaintiff's] account has been introduced to [Man Financial] by another broker, that broker is acting as [Plaintiff's] agent and [Plaintiff's] broker in this relationship is not an agent of or affiliated with [Man Financial]." In

4

addition, the document contains language that indemnifies Man Financial in the case of litigation. Plaintiff does not dispute that he signed this agreement. Finally, the Refco electronic customer agreement also indemnified Refco, but being an electronic form, Plaintiff denies that he signed the document.

A Foreign Correspondent Agreement ("FCA") was signed between Zentrum and RCG. The FCA stated that Zentrum was not an agent and prohibited Zentrum from using RCG's name in literature or promotional material. Zentrum also had a Fully Disclosed Clearing Agreement with RCG. The agreement discussed sharing commissions on a per trade basis and assigned Zentrum a sales code. It also bound Zentrum to cooperate with respect to any customer complaints or litigation, and gave RCG the authority to require Zentrum to defend or settle any such claim or demand.

An FCA was also signed between Refco and Zentrum. The FCA stipulated that Refco would pay Zentrum a share of the per trade commission paid to Refco by clients Zentrum introduced. In addition, Zentrum was assigned a sales code and was obligated to cooperate with and furnish documents to Refco in the event of any customer complaints or litigation. The FCA expressly provided that it did not create an agency relationship between Zentrum and Refco. An agreement was also made whereby MF Global housed Zentrum's server at an MF Global facility.

In addition, the arrangement between Defendants and Zentrum required Zentrum to provide the FCM with executed customers' account agreements, risk disclosure statements, and other documents when a new account was opened. These documents were FCM specific (i.e. branded with FCM logos). Although RCG's agreement that states RCG would supply the forms, Defendants contend such forms were available online to the general public. After his account

was opened, Plaintiff received account statements issued by Defendants and reflecting that the account had been introduced by Zentrum.

### C. Plaintiff's Investment Is Lost In Three Months

Once trading began, Plaintiff conferred with Ibrahim about every two weeks. From these discussions, Plaintiff learned that there were losses in the account. He was not initially concerned because of representation made by Goel that there would be losses in the first six months. About three months after the accounts were open, Ibrahim informed Plaintiff that all of the accounts had been wiped out.

At this point, Plaintiff learned that Ibrahim and Goel had a commission sharing agreement. He also reviewed his account opening forms for the first time and realized that they had been filled in with incorrect information. After meeting with a former Zentrum employee, Plaintiff further learned that many of the trades had been made manually, not by the computerized StrategyBot program, and that he had been charged hundreds of thousands of dollars in commissions.[5] Prior to seeking legal representation, Plaintiff contacted Goel, presuming him to be an agent for Defendants, but never directly contacted Defendants.

## III. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence

---

[5] In the RCG account, there were over 13,000 trades, resulting in commission over $200,000. In the Refco account, there were over 9,000 trades, resulting in commissions over $150,000. And in the Man Financial account, there were over 6,000 trades, resulting in commission over $100,000.

is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley,* 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000). I consider the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in the nonmovant's favor. *Lesch v. Crown Cork & Seal Co.,* 282 F.3d 467, 471 (7th Cir. 2002). I will accept the nonmoving party's version of any disputed fact only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996).

## IV. DISCUSSION

### A. Commodity Exchange Act Claims

The CFTC is an independent federal regulatory agency that administers and enforces the Commodity Exchange Act ("Act" or "CEA"). It is responsible for regulating numerous functions involved in the commodity markets, including the functioning of FCMs. *See* 7 U.S.C. § 1 *et seq.*; and 17 CFR § 1 *et seq.* The Act prohibits the cheating or defrauding of investors.

However, an FCM is generally not liable for the acts of a third party who has introduced accounts to the FCM. The notable exception is if the third party is an agent of the FCM; the Act imposes vicarious liability upon a principal for the acts of its agent committed within the scope of the agency.[6]

It stands then that the CEA claims against Defendants can only be successful if Zentrum acted as an agent of the Defendants.[7] Defendants predictably deny the presence of an agency relationship. Plaintiff bears the burden of proving that an agency relationship existed. *Sphere Drake Ins. Ltd. v. American General Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004) ("The party alleging an agency relationship bears the burden of proving its existence by a preponderance of the evidence").

The CEA employs a variant of the common law principle of respondeat superior. It varies from the common law only to the extent that it may be interpreted as a quasi-criminal statute and that it applies to torts committed by agents that are not necessarily employees of the principle. *Rosenthal & Co. v. Commodity Futures Trading Com'n*, 802 F.2d 963, 966 (7th Cir. 1986). *See also*, *Clayton Brokerage Co. v. Commodity Futures Trading Com.*, 794 F.2d 573, 581 (11th Cir. 1986) citing H.R. Rep. No. 565 Part I, 97th Cong., 2d Sess. 105, *reprinted* in 1982 U.S. Code Cong. & Ad. News 3871, 3954 (Stating that the CEA employs general

---

[6] Section 2(a)(1)(A) states: "For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person." 7 U.S.C. §4.

[7] Though Count IV does not explicitly depend on an agency relationship, it does require that Defendants knew or should have known of Zentrum's actions. No facts have been pled to indicate such knowledge except for the agency relationship theory; thus this count will be analyzed with the other CEA counts dependent on establishing an agency relationship.

principal-agent standards for imposing liability on principals for the acts of their agents.); *CFTC v. Gibraltar Monetary Corp.*, --- F.3d ----, 2009 WL 2150900 (11th Cir. July 21, 2009) (Reviewing the history of vicarious liability under CEA statutes and regulations and holding the CEA codifies common law principles of agency). "Whether an agency exists [under Section 2(a)] does not depend upon the alleged principal's and agent's subjective understanding of the relationship. Rather, it depends upon objective manifestations. These objective manifestations may take the form of an express written agreement or course of conduct from which an actual or apparent agency agreement may be inferred." *Palomares v. Bradshaw*, Comm. Fut. L. Rep. ¶ 28,268, 2000 WL 1466068, at *11 (C.F.T.C. Oct. 2, 2000).

The Seventh Circuit has indicated that "the ascription of agency under the Act is a purposive, policy-oriented act rather than an exercise in semantics." *Rosenthal,* 802 F.2d at 969. The policies underlying the Act's vicarious liability provision were described by the Commission in *Lobb v. J.T. McKerr & Company*:

> "Section 2(a)(1)(A)'s imposition of secondary liability on a principal for the wrongdoing of its agent protects the interest of customers by providing a source of compensation that is generally more stable and reliable than often judgment-proof…employees. Aside from providing a source of compensation for the victims of wrongdoing, the strict liability imposed by Section 2(a)(1)(A) encourages principals to take steps to limit their potential liability. As a result, principals are more likely to investigate the character and ability of agents before they are retained and to provide supervision for those activities likely to result in liability."

Comm. Fut. L. Rep. ¶ 24,568, 1989 CFTC LEXIS 608, at *34 (C.F.T.C. Dec. 14, 1989) (citing *Rosenthal*, 802 F.2d at 968, and *Anspacher & Associates, Inc. v. Henderson*, 854 F.2d 941, 945 (7th Cir. 1988)). This policy statement essentially mirrors that of the common law agency theory and does not clarify the precise reach of agency under the Act. Thus to determine whether an

9

agency relationship existed between Defendants and Zentrum, I must look at an "overall assessment of the totality of the circumstances." *Stotler and Co. v. Commodity Futures Trading Com'n.*, 855 F.2d 1288, 1292 (7th Cir. 1988).[8]

Illinois common law recognizes an agency relationship can be established by either actual authority – either express or implied – or apparent authority. "An agent has [actual] express authority when the principal explicitly grants the agent the authority to perform a particular act." *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.,* 759 N.E.2d 174, 181 (2001). Plaintiff does not allege that Zentrum had express authority, nor could such a relationship be established on the facts.

Implied actual authority is found where "the facts and circumstances show that the defendant exerted sufficient control over the alleged agent so as to negate that person's status as an independent contractor, at least with respect to third parties." *Petrovich v. Share Health Plan*, 188 Ill. 2d 17, 34-35 (Ill. 1999). "The cardinal consideration for determining the existence of implied authority is whether the alleged agent retains the right to control the manner of doing the work." *Id*. However, to find an agency relationship, the relationship between Defendants and Zentrum must go beyond that of a FCM and independent broker relationship. *See Cunningham v. Waters Tan & Co*., 65 F.3d 1351, 1357-58 (7th Cir. 1995) (noting that an agency relationship is one of broad authority, "broader than the simple registration with the commodities exchanges needed to realize a relationship in which the FCM could compensate an individual for his brokerage business by splitting commissions.") The fact that Zentrum introduced Plaintiff to

---

[8] Rulings on agency can be addressed in summary judgment. *See, e.g., Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672-76 (7th Cir. 2004) (affirming grant of summary judgment); *Rapid Delivery Serv. v. Thomson Consumer Elecs., Inc.*, 210 F. Supp. 2d 949, 954 (N.D. Ill. 2001) (granting summary judgment); *Taft Equip. Sales Co. v. Ace Transp.*, Inc., 851 F. Supp. 1208, 1218 (N.D. Ill. 1994) (granting summary judgment).

Defendants, and Defendants carried the accounts, cleared trades in them, provided back-office services for them, and compensated Zentrum on a per-trade basis does not establish an implied agency relationship for the purposes of Section 2(a)(1)(A). *See Reed v. Sage*, Comm. Fut. L. Rep. ¶ 23,943, 1987 CFTC LEXIS 161, at *25 (C.F.T.C. Oct. 14, 1986).

Neither Defendant provided Zentrum with the degree of support necessary for establishing an actual agency relationship. Defendants, competing FCMs, shared no employees with Zentrum, maintained separate ownership, did not coordinate sales efforts, and did not provide Zentrum market research or trade information. *See Gibraltar Monetary Corp.*, 2009 WL 2150900 at *6.; *Aspacher v. Kretz*, No. 94 C 6741, 1997 WL 692943, at *7 (N.D. Ill. Aug. 13, 1997). Plaintiff's reliance on the customer agreements as evidence of substantial control is undermined by clear language in the same documents indicating that Zentrum is solely responsible for its employees and expressly denying an agency relationship. Additionally, Defendants did not financially guarantee Zentrum, nor was Zentrum bound to introduce accounts solely to Defendants. *See Reed*, 1987 CFTC LEXIS 161, at *28 ("one of the cited characteristics showing the independence of agents of [FCMs] was that they frequently change from one clearing FCM to another just as a customer may change from one broker to another"(internal citations omitted)). The facts in the current case, taken in their totality, cannot establish a relationship any more substantial than the typical relationship an FCM would have with an independent, non-agent, broker.

Plaintiff relies on *Stotler* in support of its proposition that an agency relationship existed between Zentrum and Defendants. The defendant in *Stotler* was an FCM, and the court stated, "when [an FCM] assists a purportedly independent operator hoping that the operator will solicit more business for the merchant, it is hard not to find that the operator is the merchant's agent."

*Stotler*, 855 F.2d at 1292. The court went on to find an agency relationship based primarily on the facts that the agent received a 50% rebate on all commission received by the principal and that the FCM used the agent to distribute its forms and literature. *Id*. Other facts that weighed in favor of an agency relationship were (1) the agent agreed to trade exclusively with the FCM; (2) the FCM assigned the agent a salesman number and designated him a salesman; and (3) the FCM permitted the agent to telephone orders directly to the trading floor, as only employees of the FCM were allowed to do. *Id*. at 1292-93. While the facts presented in *Stotler* are similar to those asserted by Plaintiff, it is clear that the FCM in *Stotler* took additional and more significant steps to represent an agency relationship than did Defendants in this case, and a similar result must be drawn from the other cases cited by Plaintiff. Moreover, in this case, the customer agreements contained an express denial of any agency relationship between Defendants and Zentrum - there was no such express denial in *Stotler*.

Finally, apparent agency arises when a principal causes third parties to believe that an entity is its agent even though no actual authority exists. As the Illinois Supreme Court has noted:

> Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing. It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Where the principal creates the appearance of authority, the principal "will not be heard to deny the agency to the prejudice of an innocent party, who has been led to rely upon the appearance of authority in the agent." *Sphere Drake Ins. Ltd. v. American General Life Ins. Co.*, 376 F.3d 664, 672-76 (7th Cir. 2004) (citing *Gilbert v. Sycamore Mun. Hosp.*, 622 N.E.2d 788, 795 (Ill. 1993)).

To prove apparent agency, Plaintiff must establish that (1) he was induced by representations made by Defendants that Zentrum was its agent and (2) he acted with reasonable prudence and in

good faith when he relied upon Zentrum's authority. *Sphere Drake Ins.*, 376 F.3d at 672-76.

The record establishes very few representations made by Defendants that could be said to induce Plaintiff into believing Zentrum was their agent. At the time of Plaintiff's reliance, Plaintiff had never been in contact with Defendants. The sole contested act that may be attributed to Defendants is the appearance of logos on Zentrum's website. Further, Defendants took affirmative steps to disavow Plaintiff of any notion that Zentrum was an agent for the FCMs. *See Palomares*, Comm. Fut. L. Rep. P 28,268, 2000 WL 1466068, at *11 (rejecting apparent agency theory where the FCM's account opening forms "in themselves go a long way toward disproving any apparent agency"). Plaintiff's claims fail the second step of the apparent agency test, as well; his reliance on Defendant's actions cannot be said to be reasonable. As noted above, the actions upon which Plaintiff may have relied amount to presumed permission to use a logo and account opening documents that contained Defendants' logos. However, had Plaintiff reviewed the documents, he would have noticed Defendants' affirmative efforts to prevent him from believing Zentrum was their agents. The remainder of representations on which Plaintiff allegedly relied were actions that could be attributed only to Goel.

It is true that a principal may not silently allow an agent to act on its behalf then later deny the agent's apparent authority. *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1295 (Ill. App. Ct. 1987). However, Plaintiff has not demonstrated that Defendants knowingly allowed Zentrum to make such representations. At most, they knowingly allowed him to display their logo. This alone, especially when coupled with the fact that they required third parties to sign documents acknowledging their understanding that Zentrum was not an agent, cannot estop Defendants from denying an agency relationship.

Viewed in its entirety, the relationship between Defendants and Zentrum is not one of principal and agent. Defendants' motions for summary judgment must be granted for all claims based on vicarious liability under the CEA.

**B. State Law Claims**

Defendants' liability for Count V: Consumer Fraud Act; Count VI: Fraud; Count IX: Negligent Supervision; and Count X: Breach of Contract is based on the common law doctrine of respondeat superior. Though there are subtle differences between the common law and the CEA doctrines, as noted *supra*, for our purposes, the analysis can follow the same path. Thus without an agency relationship, summary judgment must be granted.

**1. Count VII**

Plaintiff alleges that a conspiracy to defraud existed between each Defendant and Zentrum. To prove such, Plaintiff would have to demonstrate (1) a conspiratorial agreement between Defendant and Zentrum to accomplish either an unlawful purpose or a lawful purpose by unlawful means, and (2) an overt act in furtherance of the agreement. *See, Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007). I agree with Defendants that Plaintiff has presented no evidence of the nature of the purported agreement to defraud, such as when it was made or by whom. The factual allegations only establish that Defendants entered into a relationship with Zentrum whereby Zentrum would open client accounts at Defendant FCMs. "A defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Id.* (citing *Adcock v. Brakegate,* 645 N.E.2d 888, 894 (Ill. 1994)). In sum, Plaintiff has not satisfied the requirements of a civil conspiracy cause of action and summary judgment must be granted.

### 2. Count VIII

Plaintiff alleges that Defendants breached the fiduciary duty owed to Plaintiff. Without an agency relationship, this claim must be based solely on the acts and duties of Defendants, without regard to Zentrum's actions or responsibilities. Defendants assert that they retained no discretion over the accounts, and thus did not owe a duty to Plaintiff beyond clearing, executing, and accounting for trades. Noting Plaintiff does not dispute Defendants performed these actions, Defendants move for summary judgment on Count VIII.

Defendants are correct that established Seventh Circuit law dictates that "[o]nly a broker operating a discretionary account – in which the broker determines which investments to make – is a fiduciary." *CFTC v. Heritage Capital Advisory Servs., Ltd.*, 823 F.2d 171, 173 (7th Cir. 1987). Plaintiff, however, would have the court believe that this is irrelevant because the account statements indicate that the accounts were "discretionary." As Defendants point out, that notation indicated Ibrahim had discretion over Plaintiff's accounts, not Defendants. This is supported by the Asset Management Agreement between Zentrum and Plaintiff that states, "Zentrum Ltd. shall have sole responsibility and exclusive authority for determining which trading transaction shall be made on behalf of Client." Viewing these documents collectively with the other agreements, it is clear that Defendants did not have discretion to determine which investments to make. Summary judgment must be granted because, without an agency or fiduciary relationship, there is no cause of action.

### 3. Count XI

In Count XI, Plaintiff alleges that Defendants were unjustly enriched. Without an agency relationship, this claim must be based solely on the act and duties of Defendants, without regard to Zentrum's actions. Defendants assert that the relationship between Plaintiff and Defendant

was governed by contract, and thus an unjust enrichment claim cannot proceed. *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985). As noted above, Plaintiff contends that he did not agree to the terms of the contract and cannot be bound by such because they were procured by fraud.

In support of Plaintiff proposition that the contracts are unenforceable, Plaintiff points to *Hesse v. Halpert and Co. Employee Profit Sharing Trust*, 1998 WL 111678 (N.D. Ill. Mar. 12, 1998). There, the court did not allow an FCM to rely on notification and exculpatory clauses in an agreement that was fraudulently procured by an agent of the FCM. However, the case notes that,

> Absent evidence of unconscionability or inconsistency with the [CEA], an FCM should be able to limit its potential liability to those actions for which it is responsible and over which it has control… To permit an FCM to exclude liability for its own precontractual misrepresentations would be inconsistent with the CEA. Courts in this district have recognized that an FCM cannot avoid liability for violations of the Act by its own agents acting within the scope of their employment.

*Id*. at *7 (internal citations omitted). Because the alleged fraudulent acts in the current case were not those of the FCMs or their agents, the same policy rationale does not apply here. I find, instead, that I am bound by *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544 (7th Cir. 1996). There, the court rejected the claims of a naïve investor even though the salesman misrepresented to him that the transaction was a safe, conservative investment and indicated the documents were "boilerplate kind of stuff." Judge Posner held that:

> The claims are barred by a very simple, very basic, very sensible principle of the law of fraud, both the law of securities fraud and the common law of fraud. If a literate, competent adult is given a document that in readable and comprehensible prose says X (X might be, "this is a risky investment"), and the person who hands it to him tells him, orally, not-X

> ("this is a safe investment"), our literate, competent adult cannot maintain
> an action for fraud against the issuer of the document. *Id*. at 547.

Consistent with this precedent, Plaintiff cannot rely on fraudulent inducement claims to void the contracts that he signed.

However, there is a genuine issue of material fact regarding whether or not Plaintiff signed the electronic forms. As noted above, Plaintiff contests that he is computer illiterate and never signed any of the electronic documents. He presumably is alleging that Goel or Ibrahim signed the documents prior to submitting them to Defendants. If this is found to be true, Plaintiff cannot be bound by such documents. Such a question of fact cannot be decided on summary judgment. Thus, summary judgment must be denied in relation to Count XI because the electronic documents are the only contracts governing the relationship between Plaintiff and RCG and Refco, and no other argument to dismiss this claim was put forward by either Defendant.

### 4. Indemnification

All three account opening forms included indemnification clauses. Defendants have filed a cross-claim for expenses related to this litigation. Because summary judgment has not been granted to Defendants on all counts, this issue cannot be addressed on summary judgment. However, if the electronic documents are found to bind Plaintiff - and the remaining claim is dismissed - the same electronic documents would require full indemnification.

## V. CONCLUSION

Summary judgment is granted for Counts I-VI, IX, and X because Plaintiff cannot establish that Zentrum was an agent of Defendants. Counts VII and VIII must also be dismissed for the reasons stated above. There is a genuine issue of material fact regarding only whether

17

Plaintiff signed the electronic agreements between Plaintiff and RCG and between Plaintiff and Refco. Therefore, Count XI, alleging unjust enrichment, and claims related to indemnification cannot be decided on summary judgment.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: August 25, 2009